UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| CHRISTINA CARLISLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:07-CV-00082 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Christina Carlisle appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I.  PROCEDURAL HISTORY

Carlisle applied for DIB and SSI in March 2003, alleging that she became disabled as of October 14, 2002. (Tr. 14, 40-42.)  The Commissioner denied her application initially and upon reconsideration, and Carlisle requested an administrative hearing. (Tr. 25-26, 36-38.)  On September 28, 2006, Administrative Law Judge (ALJ) Bryan Bernstein held a hearing, at which

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Carlisle, who was represented by counsel, Carlisle's mother, and a vocational expert testified. (Tr. 184-216.)

On November 16, 2006, the ALJ rendered an unfavorable decision to Carlisle, concluding that she was not disabled despite the limitations caused by her impairments because she could perform a significant number of jobs in the economy. (Tr. 14-22.)  The Appeals Council later denied Carlisle's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-10.)  Carlisle filed a complaint with this Court on April 6, 2007, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II.  CARLISLE'S ARGUMENTS

Carlisle alleges two flaws with the Commissioner's final decision.  Specifically, Carlisle claims that (1) the ALJ erred by determining that her testimony of debilitating limitations was "not fully reliable"; and (2) the ALJ failed to properly consider the testimony of her mother, Alyce Carlisle. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 13-17.)

## III.  FACTUAL BACKGROUND[2]

### *A.  Background and Daily Activities*

At the time of the ALJ's decision, Carlisle was thirty-seven years old; had a tenth-grade education, which included some special education classes; and possessed work experience as a certified nurse's assistant. (Tr. 40, 58, 70-71.)  Carlisle stated that she became disabled as of October 14, 2002, as a result of major depressive disorder, post traumatic stress disorder, organic

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 216-page administrative record necessary to the decision.

2

brain damage, and hemangioma with secondary headaches.[3] (Opening Br. 2.)

At the hearing, Carlisle testified that she experiences headaches every day, having been diagnosed years earlier with hemangioma. (Tr. 194-95.)  Despite taking various prescription medications, Carlisle explained that three or four times a week the headaches become severe, causing her to cease all activity and spend the day lying down in a dark, quiet room with her head elevated on a pillow. (Tr. 195.)  She stated that in 2003 and early 2004 the headaches occurred less frequently, that is, approximately twice a week. (Tr. 197.)  In addition to her headaches, Carlisle testified that she feels depressed, lacks energy, has loss of appetite, has no social life, becomes easily angry and agitated with others, and experiences feelings of suicidal ideation. (Tr. 198-99, 201, 203-04.)

Carlisle stated that her two children, ages fifteen and seventeen, live with her. (Tr. 188-89.)  She testified that they help her with household tasks, such as grocery shopping and cooking, explaining that she stopped cooking in 2004 because she had difficulty focusing on what she was doing and "almost burnt up the house." (Tr. 190-93, 202.)  Though Carlisle drives, she reported that she goes on outings infrequently, usually to the store, the children's school, or medical appointments. (Tr. 189-90.)

Carlisle's mother, Alyce Carlisle, testified that she visits Carlisle several times a week and that Carlisle appears listless and has gradually isolated herself from her family. (Tr. 208-09.) She stated that she helps Carlisle with household tasks, encourages her to perform personal hygiene, and coaxes her to leave her bedroom and sit in the living room. (Tr. 209-10.)

---

[3] Hemangioma is a vascular tumor, present at birth or developing during life, in which proliferation of blood vessels leads to a mass that resembles a neoplasm. *Stedman's Medical Dictionary* 861 (Lippincott Williams & Wilkins, 28th ed. 2006).

*B. Summary of the Relevant Medical Evidence*

In October 2002, Carlisle visited Dr. Bhupendra Shah, a neurologist, because she was having intense headaches over the last several months. (Tr. 163-64.)  She explained that she was diagnosed with hemangioma in 1990. (Tr. 163-64.)  An MRI was negative for intracranial contents, pansinusitis, and opacified air cells pertous tip on the right suggesting mastoiditis. (Tr. 106.)  He prescribed medication. (Tr. 163-64.)

From December 2002 to May 2005, Carlisle visited Dr. Shah at least eight times for her headaches. (*See, e.g.*, Tr. 151, 153, 158, 160, 162.)  At the visits, Carlisle reported that she experienced headaches of varying intensities on a regular basis, but that the medication was helping her to some extent. (Tr. 160, 162.)  Her neurological examinations were unremarkable. (Tr. 155, 158.)

On May 16, 2003, Carlisle was evaluated by Candace Martin, a psychologist, at the request of the Social Security Administration. (Tr. 107-12.)  On mental status examination, Carlisle was poorly oriented, confusing the date and her age; otherwise, Carlisle demonstrated good contact with reality and showed no evidence of a thought disorder. (Tr. 107-12.)  Her mood was sad, and her affect was appropriate to mood, displaying anxiety and depression. (Tr. 107-12.)  Dr. Martin found that her responses on mental status examination were reflective of below average intelligence and that her judgment, verbal concept formation, and insight were reflective of this level of functioning. (Tr. 107-12.)  Carlisle also demonstrated limited math skills when performing simple math problems. (Tr. 107-12.)

Dr. Martin administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), the results of which indicated that Carlisle was functioning in the mildly mentally handicapped

4

range with a verbal IQ of 62, a performance IQ of 65, and a full scale IQ of 61. (Tr. 107-12.) Dr. Martin stated that there was a 95% confidence in the accuracy of the test results. (Tr. 107-12.) Dr. Martin further noted that Carlisle's ability to function independently was limited in response to her combination of intellectual functioning and depression. (Tr. 107-12.) Nonetheless, she thought that Carlisle would likely be capable of gainful employment that required only limited social interaction, problem solving, and creativity, and that involved very routine and simplified tasks. (Tr. 107-12.) Dr. Martin diagnosed Carlisle with a depressive disorder-recurrent and mild mental retardation, assigning her a GAF score of 55.[4] (Tr. 107-12.)

The state agency psychologists, however, subsequently challenged Dr. Martin's diagnosis of mild mental retardation. (Tr. 113.) They stated that Carlisle's school records suggest at worst borderline intelligence, because most of her classes were general education and her IQ scores at that time were in the low average range. (Tr. 48-49, 113.) They also asked Dr. Martin to reconsider the fact that Carlisle had successfully obtained certification as a nurse's assistant. (Tr. 113.)

In response, Dr. Martin affirmed her diagnosis of mild mental retardation, explaining that the test scores were quite consistent and all fell within the mild mental handicapped range, which added to their probable validity. (Tr. 113.) Dr. Martin further noted that Carlisle's grades in school were all failing or near failing, that she might have been able to pass her nurse's assistant training course by merely exposure to the skills on the job, and that her work history as a

---

[4] Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). A GAF score of 55 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or any moderate impairment in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

certified nursing assistant was only brief and part-time. (Tr. 113.)  Dr. Martin also emphasized that Carlisle relied upon assistance from others with some of her daily activities and that Carlisle's IQ scores during her school years were prior to her hemangioma, suggesting that her intellect may have decreased due to brain damage from the hemangioma. (Tr. 113.)

On November 24, 2003, J. Pressner, Ph.D., a state agency psychologist, reviewed Carlisle's medical record and concluded that Carlisle had moderate limitations in her daily living activities; mild limitations for maintaining social functioning and concentration, persistence, or pace; and no episodes of decompensation. (Tr. 126.)  In addition, he completed a Mental Residual Functional Capacity Assessment, stating that Carlisle was moderately limited in a number of functional areas, including the ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted; complete a normal workday and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 130-31.)  Dr. Pressner concluded that Carlisle had the ability to perform simple, repetitive tasks. (Tr. 132.)  K. Neville, Ph.D., another state agency psychologist, later affirmed Dr. Pressner's opinion. (Tr. 132.)

In February 2004, Carlisle visited Dr. Prevesh Rustagi, a psychiatrist, for depression. (Tr. 177-78.)  Dr. Rustagi found that Carlisle's symptoms impaired her social interpersonal functioning, noting that she was hypersensitive and easily agitated. (Tr. 178.)  On mental status exam, Dr. Rustagi observed that Carlisle was easily distracted and that her short-term memory, attention, and concentration were poor. (Tr. 180.)  He also found that she had impulsive

judgement, a labile mood, and a sad affect. (Tr. 180.)  Dr. Rustagi diagnosed her with post traumatic stress disorder and major depressive disorder, recurrent, assigning her a GAF score of 50.[5]  (Tr. 181.)  Carlisle visited Dr. Rustagi again in February and March 2005 for medication adjustments. (Tr. 172-73.)  On mental status examination, she was depressed, had restricted mood, and was positive for suicidal intent. (Tr. 172-73.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

---

[5] A GAF score of 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, *supra* note 3, at 34.

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On November 16, 2006, the ALJ rendered his opinion. (Tr. 14-22.)  He found at step one of the five-step analysis that Carlisle had not engaged in substantial gainful activity since her alleged onset date and at step two that Carlisle had a severe impairment. (Tr. 16.)  At step three, he determined that Carlisle's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 16.)  Before proceeding to step four, the ALJ determined that Carlisle's testimony of debilitating limitations was "not fully reliable" and that she had the RFC to perform unskilled light work activity that involved short, simple instructions and repetitive challenges; a regimented pace of production with no close or critical supervision; and no unprotected heights or hazardous conditions. (Tr. 18-19.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Carlisle could not perform her past relevant work as a certified nurse's assistant. (Tr. 20-21.) The ALJ then proceeded to step five where he determined that Carlisle could perform a significant number of other jobs within the national economy, including an assembly machine tender, small product assembler, and housekeeper. (Tr. 21.)  Therefore, Carlisle's claim for DIB and SSI was denied. (Tr. 22.)

### C. The ALJ's Credibility Determination Is "Patently Wrong," at Least in Part, and Therefore Will Be Remanded

Carlisle contends that the ALJ improperly discounted her testimony of debilitating limitations, arguing that the ALJ inappropriately "played doctor" when interpreting her IQ test results and that he misinterpreted important evidence about her alleged blackouts, headaches,

9

and depression. (Opening Br. at 13.)  Ultimately, Carlisle's attack on the ALJ's credibility analysis has merit.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

In reaching his credibility determination, the ALJ first stated:

> The claimant's history demonstrates unreliable effort and questionable performance.  Her scores on the WAIS III reported by Dr. Martin reflect poor effort.  While she did very poorly in scholastic challenges designed for slower or special students, this does not prove that the claimant is mentally retarded.  Poor academic effort explains this outcome. The claimant has done poorly in cognitive testing despite much higher cognitive scores in high school.  This failure in testing raises important questions about the claimant's reliability in testimony.

(Tr 17 (internal citation omitted).)  The ALJ's reasoning here, however, is "patently wrong," *Powers*, 207 F.3d at 435, as he has mischaracterized the evidence of record. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (finding that ALJ's decision was not supported by substantial evidence where the ALJ had mischaracterized the medical evidence).  Neither Dr. Martin nor any other medical source of record suggested that Carlisle exhibited poor effort on

10

the WAIS III.  In fact, the record reveals quite the opposite, as Dr. Martin documented a 95% confidence in the accuracy of Carlisle's IQ test results. (*See* Tr. 109, 113.)

Furthermore, the ALJ's inference that Carlisle must have exhibited poor effort on her recent IQ test because she "had much higher cognitive scores in high school" is not reasonable based on the record. *See generally Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is "entitled to make reasonable inferences from the evidence before him").  Dr. Martin explained that Carlisle's prior scores may have been higher because they "were obtained prior to her hemangioma and may have been reflective of better intellectual skill prior to brain damage," *not* that Carlisle put forth poor effort on the IQ test. (Tr. 113.)

Moreover, the ALJ's second basis for his credibility determination does little to remedy his faulty reasoning.  To explain, the ALJ articulated that Carlisle's subjective symptoms of emotional distress and decreased intellectual dysfunction "are inconsistent in the record." (Tr. 17.)  The ALJ's only elaboration as to this point, however, is that Carlisle's testimony about blackouts, depression and headache pain is inconsistent with "her complaints to medical sources." (Tr. 17.)  Yet, the ALJ fails to provide an example of this inconsistency with any particularity so that the Court can trace his path of reasoning. *See Schmidt*, 395 F.3d at 746-47 (noting that an ALJ is required to "articulate specific reasons for discounting a claimant's testimony as being less than credible"); *Clifford*, 227 F.3d at 871-72 (remanding the ALJ's credibility determination because the ALJ failed to explain why the objective medical evidence did not support the claimant's allegations of disabling pain).  Perhaps this is because the record is not necessarily inconsistent with Carlisle's testimony.

To elaborate, Carlisle testified that at the time of the hearing she had daily headaches and

11

that they became severe three or four days a week. (Tr. 195.)  She also explained that the frequency of her headaches fluctuated over time. (Tr. 195-98.)  This testimony is seemingly consistent with Dr. Shah's records, which indicate that at times Carlisle complained of constant headaches and that at other times she reported that she had them every other day. (Tr. 151, 153, 155-58.)  Thus, the evidence of record defies the two grounds upon which the ALJ rested his credibility determination. *See* SSR 96-7p ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record . . . .").

Nonetheless, reading the opinion as a whole, the ALJ seemingly revisited Carlisle's credibility later in his opinion, inferring that her demeanor at the hearing, her work history, and her activities of daily living serve as additional means to discredit her subjective complaints.  More specifically, the ALJ stated:

> At the hearing, the claimant gave strong, confident answers and was excellently groomed.  She presented answers implying insight into medical issues and abstract issues.  Her demeanor did not imply mental retardation or borderline cognitive functioning.  She said that she drives a 98 Blazer; she is concerned about her diet[;] and she shops for groceries, although she admitted that she stopped cooking because she does not enjoy it.

(Tr. 18.)  Yet, in making this statement the ALJ appeared to "play doctor" by inventing his own signs and symptoms of mental retardation and borderline cognitive functioning, including Carlisle's "demeanor," her "strong, confident answers," and her "excellent[] groom[ing]." *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Furthermore, while indeed an ALJ should consider a claimant's activities of daily living in his credibility analysis, *see* SSR 96-7p, here the daily activities that the ALJ listed do not create an accurate and logical bridge to his conclusion that Carlisle's testimony is not credible.

12

*See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) ("We require the ALJ to build an accurate and logical bridge from the evidence to [his] conclusions so that we may afford the claimant meaningful review . . . ."). To explain, Carlisle stated that she drives only when needed for medical appointments and to the store if she can get no one else to go for her; this testimony does not appear to be contradicted in the record. Furthermore, Carlisle said that she stopped cooking because of her decreased attention span and fear of fire, *not* due to a dislike of cooking as the ALJ articulated. (Tr. 191 ("I like to cook, because I like the - - I eat. But . . . my attention span doesn't stay on focus that long just to actually stand there and cook. I almost burnt down the house when the last time I had tried to cook something.").) Finally, it is unclear how any concern by Carlisle about her diet leads to the ALJ's conclusion that she is not credible.

Admittedly, the ALJ observed elsewhere in his decision, and accurately so, that Carlisle's ability to obtain certification as a nurse's assistant undermines any testimony or medical opinion of mild mental retardation. (Tr. 17.) However, in this context, where the ALJ was "patently wrong" in part of his credibility analysis and failed to build an accurate and logical bridge between other evidence of record and his conclusion, this observation standing alone is insufficient to support the ALJ's credibility determination. *See Steele*, 290 F.3d at 941 ("[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is enough evidence in the record to support the decision, the reasons given by the

13

trier of fact do not build an accurate and logical bridge between the evidence and the result.").

Moreover, the Commissioner's argument that Carlisle's subjective complaints lack the support of objective medical evidence also fails to salvage the ALJ's credibility determination; while the argument may ultimately have merit, it cannot serve as a basis for affirming the ALJ's credibility determination because it is *post hoc*. *See Patterson v. Barnhart*, 428 F. Supp. 2d 869, 883 (E.D. Wis. 2006) ("The problem with the Commissioner's position is that the ALJ did not adopt it."); *Mirza v. Barnhart*, No. 00 C 8003, 2002 WL 731781, at *7 (N.D. Ill. Apr. 25, 2002) ("[T]he Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision."). The ALJ simply failed to connect the dots between any lack of objective medical evidence in the record and his credibility determination, (*compare* Tr. 17, *with* Tr. 19), and the Commissioner cannot bridge the gap for him at this juncture. *See Steele*, 290 F.3d at 941; *see generally Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (reversing an ALJ's decision where he failed to "sufficiently connect[] the dots" between the claimant's impairments and his RFC finding).

Consequently, the ALJ's credibility determination will be remanded to the Commissioner for further consideration.[7]

## VI.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this

---

[7] Because a remand is warranted on Carlisle's first argument, the Court does not need to reach her second argument – that the ALJ failed to properly evaluate the testimony of her mother.

Opinion.  The Clerk is directed to enter a judgment in favor of Carlisle and against the Commissioner.

     SO ORDERED.

     Enter for this 22nd day of January, 2008.

                                              S/Roger B. Cosbey
                                              Roger B. Cosbey,
                                              United States Magistrate Judge